## CANNON *v.* GORHAM.

1. Where an execution for unpaid taxes was issued by the comptroller-general against a certain tract of unreturned wild land, under the act of February 28, 1874 (Acts 1874, p. 105), and a sale of the land was made thereunder, and the execution was returned to the comptroller's office with the official entries thereon, it became an office paper, and a certified copy of such execution and entries was admissible in evidence in lieu of the original.

2. The inclusion in a form of sheriff's deed, in describing the tax execution, of the expression "transferred to . . , of . . county," did not vitiate the sale, or render the deed inadmissible in evidence, where it appeared from the entries on the execution that no transfer of it was in fact made, and no evidence to the contrary was adduced.

3. Where a deed, purporting to have been made by a corporation, recited that its corporate name was signed by the president and the corporate seal attached by the secretary, and the name of the corporation was signed by the president and followed by "(L..S.)," this was prima facie evidence of authority on the part of the president to execute such deed.

(*a*) If the deed was duly recorded and lost, a certified copy from the record was admissible in evidence, without further proof of. the authority to execute it.

4. Under the act of February 28, 1874 (Acts 1874, p. 105), amended by the act of March 2, 1875 (Acts 1875, p. 119), the prescribed advertisement of unreturned wild or unimproved land was necessary before the issuance of execution for the tax assessed against it. An execution issued without such precedent advertisement was void, and no valid sale could be made thereunder.

5. If the comptroller-general failed to publish the requisite notice as to a lot of wild land for one year, and later issued an execution for a single amount as including the taxes due on the lot for that and two other years, a sale under such execution was invalid.

6. Where a legislative act required the publication of a notice "in one newspaper at the capital" once a week for four weeks, as a condition precedent to the issuance of an execution for taxes against a tract of wild or unimproved land, this requirement was not met by the publication of such notice twice in a daily newspaper and twice in a weekly, though both were published by the same publisher, and the weekly was made up largely of news items taken from the daily, the two having different advertising accounts, being sent to different sets of subscribers, mainly in different localities, and being shown to be like two separate newspapers, except as stated.

APRIL 13, 1911.

Ejectment. Before Judge Whipple. Wilcox superior court. March 24, 1910.

*M. B. Cannon, J. G. Cranford, E. K. Wilcox,* and *Edgar Watkins,* for plaintiff in error.

*Hal Lawson* and *E. H. Williams,* contra.

LUMPKIN, J. Gorham brought an action of ejectment against Cannon. The plaintiff claimed by virtue of a chain of title beginning with a tax sale under an execution issued by the comptroller-general against the land in dispute as wild or unimproved land, under the act of 1874 (Acts 1874, p. 105), amended by the act of 1875 (Acts 1875, p. 119). The defendant claimed under a chain of title extending back to the original grant from the State. The case turned upon the validity of the tax sale. The presiding judge directed a verdict in favor of the plaintiff.

1. Objection was made to the introduction in evidence of a transcript of the execution and entries thereon certified by the comptroller-general, in whose office the execution was on file after the sale. The act of 1874 provided that the comptroller-general should issue the execution, and that the sheriff should make the sale and make returns thereof. When this was done, the paper became a document or paper of file in the comptroller-general's office, and a certified copy of the execution and entries was admissible in evidence. Civil Code (1910), § 5798; 17 Cyc. 329.

2. The sheriff apparently used a form of deed, in which was a clause for use if the execution had been transferred. After describing the execution, the deed contained these words: "Which said execution has been duly transferred by said comptroller to . . . , of . . . county." The execution, with the entries upon it, showed no transfer, nor was there any other evidence of one. This furnished no ground for excluding the deed from evidence.

3. Several points were raised as to the introduction of a certified copy of an established copy of a deed. But a certified copy of the original deed from the record was introduced, and the only material questions were whether it sufficiently appeared that the corporate seal of the company named as the grantor was attached to the deed, and that the person signing as president had authority to execute it. There was evidence that the person so signing was the president of the company. The certified copy from the record contained a statement that the corporation had caused its corporate name to be signed by its president and its corporate seal to be attached by its secretary. It was signed, "The Savannah, Americus & Montgomery Railway (L. S.) by S. H. Hawkins, President (L. S.)," and was duly attested. The absence of the original being sufficiently accounted for, a certified copy from the proper record

is admissible to show the existence, genuineness, and contents of the deed. *Eady* v. *Shivey,* 40 *Ga.* 684; *Holtzclaw* v. *Edmondson,* 114 *Ga.* 171 (39 S. E. 849). If a deed is executed in the name of a corporation by its proper officer, with the corporate seal attached, a presumption of authority on his part to execute it arises, and this is a sufficient prima facie showing to admit the deed in evidence. *Solomon's Lodge* v. *Montmollin,* 58 *Ga.* 547; *Carr* v. *Georgia Loan & Trust Co.,* 108 *Ga.* 757 (33 S. E. 190); *Dodge* v. *American Freehold etc. Co.,* 109 *Ga.* 394 (34 S. E. 672); *Almand & George* v. *Equitable Mortgage Co.,* 113 *Ga.* 983 (39 S. E. 421).

Section 5 of the Code of 1910 declares that the word "seal shall include impressions on the paper itself, as well as impressions on wax or wafers. With the exception of official seals, a scrawl, or any other mark intended as a seal, shall be held as such." No distinction is made in this statute between the seal of a corporation and that of an individual. The letters L. S. are an abbreviation of locus sigilli, the place of the seal; and it has been said that they are "usually inserted within brackets in copies of documents to indicate the position of the seal in the original." Century Dictionary. A clerk, in recording a deed of a corporation on which a seal is impressed, probably would not often attempt to make an exact reproduction of the seal, with all the insignia, marks, or emblems which might be upon it. It would hardly be held that his inability to do so would destroy the right to introduce certified copies of such deeds. But treating the copy as in this respect identical with the original, it is a matter of common knowledge that these letters, with the enclosing parentheses or brackets, are often used, in this State, at least by individuals, as a seal, without more. Numerous instances of such use appear in the reports of this court. The deed reciting that the seal was attached, these letters with the enclosing parentheses, following the signature, were apparently intended as a seal. In *Johnston* v. *Crawley,* 25 *Ga.* 316 (71 Am. D. 173), it was held that if an agent of a corporation has authority to execute a mortgage, and affixes thereto anything which the law recognizes as a seal when affixed by a natural person, it will be a good execution presumptively by the corporation. The seal there held to be sufficient was the same as that now under consideration. In the opinion it was said: "If they adopt a seal different from their corporate seal for a special occasion, or if they have no corporate seal, the seal

adopted is the corporate seal for the time and the occasion. If a corporate body choose to adopt a scroll as their common seal, why may it not do it? It can not, at the common law, because a scroll can not, by that law, be a seal. But a scroll is made a seal by statute in this State, and there is no reason why it may not be adopted by a corporation here, either as a common seal, or as a seal for a special purpose." See also *Jones* v. *Ezell,* 134 *Ga.* 553 (3), (68 S. E. 303); *Nelson* v. *Spence,* 129 *Ga.* 35 (58 S. E. 697); *New York Life Ins. Co.* v. *Rhodes,* 4 *Ga. App.* 25 (60 S. E. 828); *American Investment Company* v. *Cable Company,* Id. 106 (60 S. E. 1037); Powell on Actions for Land, § 221.

In other States the strictness of the common-law rule as to corporate seals has been much relaxed either by statute or by judicial construction. Angell & Ames on Corp. (11th ed.) § 226; Brown *v.* Cohn, 85 Wis. 1 (54 N. W. 1101, 20 L. R. A. 182, and citations); Mill Dam Foundery *v.* Hovey, 21 Pick. 417; Reynolds *v.* Glasgow Academy, 6 Dana, 37; Phillips *v.* Coffee, 17 Ill. 154 (63 Am. D. 357).

4, 5. Under the sixth section of the act of 1874 (Acts 1874, p. 105), the provision for the publishing of an advertisement for a prescribed time and in the prescribed manner, before the issuance of an execution against a lot of wild or unimproved land, was mandatory. This is made plain by the seventh section, which declares, that, "On the expiration of the time of advertisement, the comptroller-general shall issue execution against all unimproved or wild lands not returned for State and county tax." The advertising of the notice calling on the owners to come forward and give in and pay the tax was a necessary step precedent to the issuing of executions. The time for which such advertisement should be made was changed by the act of March 2, 1875 (Acts 1875, p. 119), from thirty days to once a week for four weeks. An execution issued without such advertisement was illegal. If the advertisement was duly made, mere delay for two or three years in issuing the execution for the tax for a certain year would not render it invalid. But if the comptroller-general delayed for several years, and then issued an execution for a single sum as including taxes for three years, and an advertisement had been made for two of them, but not for the third, the execution for the single sum thus sought to be summarily enforced was invalid.

6. The acts above cited required that the advertisement, calling on the owners of unimproved or wild lands to come forward and give in and pay the taxes thereon should be published "in one newspaper at the capital of the State" once a week for four weeks. The evidence showed, that the same company published a daily and a weekly paper, or a daily and weekly edition of a paper, which were referred to in the evidence as the Atlanta Daily Constitution and the Atlanta Weekly Constitution; that there were separate subscription lists and separate advertising accounts for the two papers, although the same persons had authority to contract for advertisements in either, and to employ agents for both; that very few, if any, persons were subscribers for both papers; that the weekly paper was largely, though not entirely, made up of news matter compiled from the columns of the daily; but that in other respects the two papers were treated as distinct; and that weekly editions of daily newspapers generally circulate in rural districts. It was shown that the advertisements in regard to the land in controversy were published in the Atlanta Daily Constitution on August 31 and September 7, 1877, and in the Atlanta Weekly Constitution on September 11 and 18. One question was whether this was a sufficient compliance with the law.

In Hull v. Chicago etc. R. Co., 21 Neb. 371 (32 N. W. 162), it was held that a similar publication of a notice of an intention to exercise the right of eminent domain in the condemnation of the real estate of a non-resident was not legal, and that proceedings dependent thereon for the purpose of jurisdiction were void. In the opinion Reese, J., stated that the statute required the condemning corporation to give four weeks notice to the landowner "by publication four consecutive weeks in some newspaper published in the county" where the real estate sought to be appraised was situated. He then said: "Did the publication referred to comply with this requirement of law? Clearly not. As well might the publication have been in four 'different and separate' newspapers as in two. The fact that the papers were published by the same publishing company could have no bearing upon the question." In Tully v. Bauer, 52 Cal. 487, it was held, that "When a statute requires that the delinquent tax list, together with the time and place of sale of the property for the delinquent tax, shall be published in a paper in the city or county, or in a supplement to such paper,

such list, time, and place, if published in a supplement, must be published in one the circulation of which is coextensive with that of the paper both in and out of the city and county." Advertisements of this character precedent to assessing taxes are matters of statutory requirement, and must be made as the statute prescribes. 27 Am. & Eng. Enc. Law (2d ed.), 826; Ronkendorff v. Taylor's Lessee, 4 Peters, 349 (7 L. ed. 822); Bussey v. Leavitt, 12 Me. 378.

The decision in *Bentley* v. *Shingler,* 111 *Ga.* 780 (36 S. E. 935), was cited as holding that an advertisement similar to the one made in the present case was sufficient. But no question was there raised as to publishing the advertisement for a part of the time in a daily and partly in a weekly newspaper. The ruling made was that a statutory requirement, that a given advertisement shall be published in a designated paper "once a week for four weeks" before a particular thing can lawfully be done, was complied with if the advertisement was inserted in that paper four times, in as many separate, consecutive weeks, and the first insertion was made in an issue of the paper published twenty eight or more days before the thing in question was done.

In the brief of counsel for defendant in error it was stated broadly, that, if the proceeding involved in the present case was held to be invalid, this would overrule former decisions holding similar titles valid. No decision of this court was cited in which the grounds upon which we hold this proceeding invalid were advanced and determined, and we know of none. The act of 1874, as amended by that of 1875, was attacked as unconstitutional. But the point does not appear to have been passed upon in the trial court.         *Judgment reversed. All the Justices concur.*